Kathleen I. Gibbs v. Commissioner. George W. Gibbs v. Commissioner.
Gibbs v. Commissioner
Docket Nos. 57430, 57431.
United States Tax Court
T.C. Memo 1959-38; 1959 Tax Ct. Memo LEXIS 204; 18 T.C.M. (CCH) 178; T.C.M. (RIA) 59038; February 27, 1959
Paul R. Scott, Esq., Ingraham Building, Miami, Fla., and Marshall S. Scott, Esq., for the petitioners. Robert O. Rogers, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion In these two cases (Docket Nos. 57430 and 57431), which are consolidated for hearing and opinion, respondent has determined deficiencies in Federal gift taxes for the year 1951 in the respective amounts of $23,231.25 and $24,131.25. The deficiencies result from respondent's determination that common stock of Gibbs Corporation, the subject matter of the gifts here in question, had a value at the date of gift of $2,500 a share instead of the value of $1,000 a share placed upon them in petitioners' gift tax returns. Findings of Fact Those facts stipulated and the exhibits attached thereto are made a part *205 of our findings by this reference. Petitioners George W. and Kathleen I. Gibbs, husband and wife hereinafter sometimes referred to as "George" and "Kathleen," are individuals residing in Jacksonville, Florida. They filed their Federal gift tax returns for the taxable year 1951 with the district director of internal revenue for the State of Florida. On June 5, 1951, George and Kathleen made individual separate gifts to their son George W. Gibbs, Jr., hereinafter sometimes referred to as "George, Jr.," of 75 and 68 shares, respectively, of the common stock of the Gibbs Corporation, hereinafter sometimes referred to as "the corporation." They reported these gifts and paid a gift tax based upon a value of $1,000 per share. The corporation is a closely held one, incorporated in Florida. It has its principal place of business in Jacksonville. It was originally incorporated in 1911 as the Gibbs Gas Engine Company and changed its name in 1945 to the Gibbs Corporation. Originally the corporation made marine motors but later expanded its business to the building and repairing of small vessels. George W. Gibbs and J. D. Weed, hereinafter sometimes referred to as "Weed," originally organized *206 the corporation. The stock of the corporation is not listed on any exchange and is not traded over the counter. The outstanding common stock of the corporation consisted, at all times relevant to these proceedings, of 445 shares of $100 par, held by the following shareholders as of the dates indicated: Common
Stock
Held
Kath-
George
Oth-
as of:
George
leen
Jr.
Weed
ers
12-26-41
228
0
0
202
15
12-30-41
100
83
105
157
0
12-30-48
78
68
142
157
0
6-6-51
3
0
285
157
0
From the beginning of the corporation to 1941 George and Weed (George's brother-in-law) were its principal executives, George being president. George, Jr., had worked for the corporation when he was a boy. In 1941 George, Jr., was made secretary-treasurer of the corporation and a member of its board of directors. He quickly demonstrated his capacity as an executive to George and Weed. At the same time he was offered positions outside of the company paying higher salaries than he was receiving from the company. In order to retain his services to the corporation George and Weed agreed to and did give George, Jr., a substantial stock interest in the corporation, *207 George giving him 48 shares and Weed giving him 45 shares, both gifts being made on December 27, 1941. At or about the same time, George, Jr., purchased 11 shares from one of the minority stockholders listed as "Others" in the above table at $90.91 a share and 1 share from another for $100. On December 29, 1941, George gave Kathleen 83 shares of the corporation's common stock. In 1941 the company authorized and issued 1,490 shares of 6 per cent cumulative $100 par preferred stock, redeemable at $105 per share. From 1941 to June 6, 1951, this preferred stock was held as follows: George
200 shares
Kathleen
466 shares
George, Jr.
360 shares
Weed
464 shares
On December 31, 1941, a dividend of $200 per share was paid on the common stock. The stockholders simultaneously purchased preferred stock at par. This was the only dividend paid on the common stock during the period relevant to these proceedings. In 1942 a $9,000 dividend was paid on the preferred stock, being the only dividend paid on the preferred stock during the period relevant to these proceedings. As of May 27, 1951, there were arrearages of the cumulative dividend on the preferred stock amounting to *208 $75,245, or $50.50 per share. Officers' salaries, including incentive bonuses, paid by the Gibbs Corporation for 1947 to 1950, inclusive, as shown by the books and records of the corporation, are as set forth in the following schedule: Total For
Family Hold-
Joseph D. Weed
Year Sala-
George W.
George W.
ing Stock
Minority
ries Paid
Gibbs
Gibbs, Jr.
Control
Stockholder
Total
1947
$35,000
$25,000
$ 60,000
$10,000
$ 70,000
1948
42,750
32,750
75,500
10,000
85,000
1949
20,000
15,000
35,000
10,000
45,000
1950
77,500
72,500
150,000
10,000
160,000 In 1950 a salary base of $35,000 each to George W. Gibbs and George W. Gibbs, Jr., was restored by the corporation, and said two officers were reimbursed for a total of $35,000 cut from their 1949 salaries, and each received an incentive bonus of $22,500 additional. The 1951 base salary was also $35,000 each for George W. Gibbs and George W. Gibbs, Jr., and $10,/00 for Joseph D. Weed. Provision for an incentive bonus by the corporation was made on January 30, 1948, providing for 9 1/2 per cent of net profit before tax to be distributed as follows: Per cent
President
2 1/2
Chairman
2 1/2
Vice President, Marine Division
1 1/2
Vice President, Equipment Division
1 1/2
Vice President, Comptroller
1 1/2
*209 An additional 2 1/2 per cent incentive bonus was to be distributed to other key employees selected at the time the annual bonus was declared. [1]
At some time in 1948 George, Jr., became concerned over the possible effect of the death of his parents and Weed on his position in and control of the corporation. His parents had two children, himself and a sister. Weed had four children and eight grandchildren. George, Jr., did not want to devote his entire life to the corporation if there was a possibility of finding himself in the position of a minority stockholder upon the death of his parents and Weed and the settlement of their estates. George and Kathleen were interested in effecting an approximately equal division of their estates between George, Jr., and his sister, but with their common stock interests in the corporation going to George, Jr. In 1948 George, Jr., proposed that he purchase some additional shares of the stock of the corporation and obtain an option on other shares owned by his parents at a fair value such as would be satisfactory to his parents and sister. At his suggestion an appraisal of the stock *210 made by an independent appraiser, Standard Research Consultants, was used for the purpose of determining what its fair market value was as of December 30, 1948. The appraisal made earlier in 1948 by Standard Research Consultants in connection with the possible sale of the corporation's stock to outside interests was tentative in that it was subject to revision upon an examination of the corporation's audit reports for 1948 when they became available in 1949. The tentative appraisal was an "outside figure" of $1,100 a share. The revised appraisal made in 1949 was $800 a share. The fair market value of the common stock of the corporation as of December 30, 1948, was not in excess of $1,100 a share. On December 30, 1948, George sold 19 shares of common stock to George, Jr., at a price of $1,100 per share. In payment George, Jr., gave his father $900 in cash and transferred to him a note in the amount of $20,000. On that date George, Jr., signed the following letter to his father: "I hereby offer to purchase from you 19 shares of Gibbs Corporation common stock at the price of $1,100 per share (being the price fixed by independent appraisers) provided you will grant me an option for *211 ten years on your remaining 78 shares at the same price per share and provided that Mother will grant me an option on her 68 shares for the same period and at the same price per share." And on the same day George executed the following option: "I, GEORGE W. GIBBS, of Jacksonville, Duval County, Florida, for myself and my personal representatives, being the record holder and owner of 78 shares of the capital stock of Gibbs Corporation, a Florida corporation, for and in consideration of the sum of Ten Dollars ($10.00) to me paid by George W. Gibbs, Jr., receipt of which is hereby acknowledged, hereby grant to the said George W. Gibbs, Jr., an option for the period of ten years from the date hereof to purchase any number of the shares of the capital stock owned by me in the Gibbs Corporation not exceeding 78 shares, at the price of Eleven Hundred Dollars ($1100.00) a share, exercisable by signifying his intention to purchase the same by notice in writing to me or my personal representatives, and a failure to serve such notice in writing within the period of ten years shall terminate this option without further action, time being the essence of this agreement. "IN TESTIMONY WHEREOF, *212 I have hereunto set my hand and seal this 30th day of December, A.D. 1948." And Kathleen executed this option: "I, KATHLEEN GIBBS, of Jacksonville, Duval County, Florida, for myself and my personal representatives, being the record holder and owner of 68 shares of the capital stock of Gibbs Corporation, a Florida corporation, for and in consideration of the sum of Ten Dollars ($10.00) to me paid by George W. Gibbs, Jr., receipt of which is hereby acknowledged, hereby grant to the said George W. Gibbs, Jr., an option for the period of ten years from the date hereof to purchase any number of the shares of the capital stock owned by me in the Gibbs Corporation not exceeding 68 shares, at the price of Eleven Hundred Dollars ($1100.00) a share, exercisable by signifying his intention to purchase the same by notice in writing to me or my personal representatives, and a failure to serve such notice in writing within the period of ten years shall terminate this option without further action, time being of the essence of this agreement. "IN TESTIMONY WHEREOF, I have hereunto set my hand and seal this 30th day of December, A.D. 1948." These options were not obtained or executed in contemplation *213 of any future gifts of the corporation's stock to George, Jr., nor was it intended by anyone that an object of the execution of these options would be to depreciate the value of this stock for Federal gift or estate tax purposes. Also on December 30, 1948, George gave his son 3 shares of Gibbs common stock and Kathleen gave him 15 shares. Both donors filed Federal gift tax returns on March 15, 1948, reporting the gifts of stock at a value of $1,100 per share. Respondent did not and does not question such value as of December 30, 1948. The ownership of the common shares of Gibbs Corporation, immediately prior to the gifts in issue, was as follows: Kath-
George,
George
leen
Jr.
Weed
78
68
142
157
In the first part of 1951 counsel for George and Kathleen reviewed their wills and consulted with the person keeping their books and records as to their assets. It was learned that between December 30, 1948, and May 1, 1951, there was an appreciation in the market value of the common stock (other than that of the corporation) owned by Kathleen of about $50,000, and an appreciation in the value of real estate owned by George of approximately $200,000. Counsel *214 advised George and Kathleen that increased estate taxes might be anticipated. Being satisfied in 1951 that the value of their other assets intended for ultimate bequest to their daughter was equal to the value of their stock interest in the corporation, George and Kathleen decided in June of 1951 to give to George, Jr., all but 3 shares of their common stock in the corporation for the primary purpose of saving on estate taxes. Again an appraisal of the stock was made by Standard Research Consultants who determined in 1951 that the fair market value of the stock as of June 5, 1951, was not in excess of $1,000 a share. Thereupon the value of $1,000 a share was used in the gift tax returns covering the gifts here in issue. In April of 1954, after negotiations starting in 1953, Weed and the corporation agreed in principle to the sale of Weed's entire equity interest in the Gibbs Corporation to the corporation - both preferred and common stock - for $250,000. On November 11, 1954, a contract was executed between Weed and the corporation whereby he sold his 157 shares of common stock for approximately $1,296 per share and his 464 shares of preferred stock at par or $100 per share. The *215 corporation paid $25,000 at closing and gave Weed 4 promissory notes on which it was personally liable in the amount of $5,625 each, or a total of $22,500, payable on November 11, 1955, and 36 promissory notes in the amount of $5,625 each, maturing at the rate of 4 notes a year beginning on November 11, 1956, and ending November 11, 1964. The corporation was not personally liable on these notes, the only security being the stock and life insurance policies on the life of George, Jr., in the amount of $200,000, the premiums on which were to be paid by the corporation. The sale of Weed's stock in 1954 was an arm's length transaction. In 1954 the condition of the corporation with regard to its cash position, working capital, and earned surplus was better than it was in 1951. The corporation's operations were relatively small and unprofitable during the pre-World War II years 1936 to and including 1940. Sales ranged from $119,000 to $303,000 and averaged $195,000 a year. During each of these years the corporation operated at a loss. During this prewar period the total assets of the corporation amounted to an average of $278,065. In 1941 there was an upsurge in the shipbuilding business *216 because of the need for ship and repair facilities in connection with the war effort. Sales increased from less than $200,000 in 1940 to more than $3,000,000 in 1941. This boom continued throughout the war until 1945 when there were sales in excess of $14,000,000, but ended in 1946 when the sales from the shipyard division fell to $2,588,894. During the war, in addition to its original facilities the corporation operated an outfitting yard adjacent to its original plant under a lease from the United States Navy. Total sales in this war period ranged from $11,357,011 in 1942 to $14,186,688 in 1945. Commencing in 1944, in anticipation of the end of the war and in an attempt to counter the "feast or famine" character of the ship repair business, the management of the corporation attempted to diversify its business by going into the manufacture of clothing, furniture, and store fixtures, and the sale of electronic equipment - fields in which the management had no prior experience. The corporation abandoned all of these ventures, and also liquidated its division producing small boats called "Sea Skiffs," in 1947 and 1948, losing in excess of $800,000 in their operation, abandonment, and *217 liquidation. A summary of losses and expenses incurred as a result of these ventures follows: Year
Year
Total Amount
Business
Started
Ended
of Loss
Locarno of Florida Clothing Division
(manufactur-
ing children's clothing)
1944
1947
$366,574
Electronic Division (sales agency) (sale of
radar and
depth recording gear)
1946
1947
75,277
Sea Skiffs Division (manufacturing 18foot
1947
99,260
runabouts)
Furniture and Store Fixtures Division
(manufactur-
ing wood furniture and fixtures)
1946
1948
307,360
TOTAL
$848,471
In 1946 the corporation acquired a franchise from the Caterpillar Tractor Company to distribute its products in 34 counties in northern Florida. In 1952 the corporation gave up the major portion of this franchise. Although the Caterpillar franchise increased gross sales the inventory requirements were so high that it did not prove to be a successful business venture. After the war, profits of the corporation dropped sharply. In the period 1946 to 1950, net sales of the corporation, inclusive of the operation of the Caterpillar franchise, called the "Equipment Division," but exclusive of the other activities discussed *218 above as attempts to diversify, averaged approximately $5,458,000. The net sales of the "Shipyard Division" averaged approximately $2,572,000 and the net sales of the "Equipment Division" averaged approximately $2,886,000. A comparative income account of the corporation for the years ended December 31, 1944 through 1950 and 5 months ended May 27, 1951, reflecting this diversification and postwar operation, reads as follows: 1944
1945
1946
1947
Net Sales: Shipyard Division
$13,056,725
$14,186,688
$2,588,894
$1,835,451
Equipment Division
1,072,767
2,582,789
Total
$13,056,725
$14,186,688
$3,661,661
$4,418,240
Cost of Sales: Shipyard Division
$ 9,764,359
$ 9,212,006
$2,107,831
$1,674,720
Equipment Division
828,880
2,014,985
Total
$ 9,764,359
$ 9,212,006
$2,936,711
$3,689,705
Depreciation: Shipyard Division
$ 133,855
$ 171,455
$ 89,506
$ 59,813
Equipment Division
7,048
18,261
Total
$ 133,855
$ 171,455
$ 96,554
$ 78,074
Gross Profit: Shipyard Division
$ 3,158,511
$ 4,803,227
$ 391,557
$ 100,918
Equipment Division
236,839
549,543
Total
$ 3,158,511
$ 4,803,227
$ 628,396
$ 650,461
Administrative, selling and
2,492,853
2,983,593
579,051
476,380
other expenses
Net operating profit
$ 665,658
$ 1,819,634
$ 49,345
$ 174,081
Other income
41,446
36,887
77,903
28,409
Total income
$ 707,104
$ 1,856,521
$ 127,248
$ 202,490
Other Deductions and Losses: Loss on cafeteria
$ 11,035
$ 14,915
$ 11,445
Loss on clothing manufacture
45,650
(12,520)
15,612
$ 317,832
Loss on electronics division
75,277
Liquidation of sea skiffs
99,260
division
Loss on furniture and store
53,819
126,671
fixture division
Postwar adjustments
90,135
Total Other Deductions and
$ 56,685
$ 2,395
$ 80,876
$ 709,175
Losses
Net profit before Federal
$ 650,419
$ 1,854,126
$ 46,372
$ (506,685)
income tax
Federal income tax
478,790
1,398,914
14,899
Net Profit
$ 171,629
$ 455,212
$ 31,473
$ (506,685)
*219 1948
1949
1950
To 5-27-51
Net Sales: Shipyard Division
$2,067,163
$2,498,722
$3,868,248
$2,814,585
Equipment Division
3,013,156
2,729,760
5,033,544
1,956,349
Total
$5,080,319
$5,228,482
$8,901,792
$4,770,934
Cost of Sales: Shipyard Division
$1,437,273
$1,777,890
$2,636,639
$2,131,829
Equipment Division
2,399,500
2,232,457
4,071,939
1,523,559
Total
$3,838,773
$4,010,347
$6,708,578
$3,655,388
Depreciation: Shipyard Division
$ 82,174
$ 68,440
$ 79,519
$ 48,767
Equipment Division
26,993
33,323
33,709
11,106
Total
$ 109,167
$ 101,763
$ 113,228
$ 59,873
Gross Profit: Shipyard Division
$ 547,716
$ 652,392
$1,152,090
$ 633,989
Equipment Division
586,663
463,980
927,896
421,684
Total
$1,134,379
$1,116,372
$2,079,986
$1,055,673
Administrative, selling and
1,019,181
952,429
1,328,103
585,049
other expenses
Net operating profit
$ 115,198
$ 163,943
$ 751,883
$ 470,624
Other income
54,147
39,983
88,306
24,449
Total income
$ 169,345
$ 203,926
$ 840,189
$ 495,073
Other Deductions and Losses: Loss on cafeteria
Loss on clothing manufacture
Loss on electronics division
Liquidation of sea skiffs
division
Loss on furniture and store
$ 126,870
fixture division
Postwar adjustments
Total Other Deductions and
$ 126,870
Losses
Net profit before Federal
$ 42,475
$ 203,926
$ 840,189
$ 495,073
income tax
Federal income tax
21,725
25,077
440,000
306,746
Net Profit
$ 20,750
$ 178,849
$ 400,189
$ 188,327
*220 A comparative balance sheet for the years ended December 31, 1946 through 1950, reads as follows: ASSETS
1946
1947
1948
1949
1950
Current Assets: Cash
$ 67,975
$ 64,419
$ 102,783
$ 222,306
$ 311,794
Marketable
145,309
22,688
securities
Notes and
752,621
742,505
566,558
660,421
982,324
accounts
receivable
Inventories
1,163,574
763,310
1,181,074
1,105,358
1,210,881
Claim for tax
365,759
refund
Prepayments
48,780
83,171
49,706
49,204
155,123
Total Current
$2,178,259
$2,019,164
$1,922,808
$2,037,334
$2,660,122
Assets
Plant, property
$ 304,601
$ 230,985
$ 723,998
$ 738,968
$1,077,672
and equipment,
net
Real estate
investment
Mortgage
182,050
receivable
Cash value of
8,642
8,990
9,216
9,420
9,942
life insurance
Other assets
97,115
80,765
43,881
74,048
49,945
Total Assets
$2,770,667
$2,339,904
$2,699,903
$2,859,770
$3,797,681
LIABILITIES
Current
Liabilities: Notes payable
$ 653,500
$ 362,249
$ 334,205
$ 323,305
$ 445,553
Mortgage payable
25,000
25,000
25,000
- current portion
Accounts payable
557,982
743,083
573,335
685,720
1,056,730
and accrued
expenses
Advances on
contracts
Advances from
83,434
41,704
stockholders
Accrued Federal
14,899
412,415
410,723
468,941
income taxes
Total Current
$1,226,381
$1,105,332
$1,428,389
$1,486,452
$1,996,224
Liabilities
Long-Term
Liabilities: Mortgage payable
$ 162,500
$ 137,500
$ 112,500
Notes payable -
29,865
16,326
69,276
banks and others
Notes payable to
$ 50,000
$ 143,084
230,000
230,000
230,000
stockholders
Total Long-Term
$ 50,000
$ 143,084
$ 422,365
$ 383,826
$ 421,776
Liabilities
Capital Stock and
Surplus: Preferred stock,
$ 150,000
$ 149,000
$ 149,000
$ 149,000
$ 149,000
6% cum., $100 par
Common stock,
45,000
44,500
44,500
44,500
44,500
$100 par
Earned surplus
1,299,286
897,988
655,649
795,992
1,196,181
Total Capital
$1,494,286
$1,091,488
$ 849,149
$ 989,492
$1,389,681
Stock and Surplus
Total Liabilities
$2,770,667
$2,339,904
$2,699,903
$2,859,770
$3,797,681
Contingent
Liability on
Retain Title
Equipment Sales
Contracts
discounted
with recourse
$ 103,846
$ 453,911
$ 874,774
$1,492,675
Cumulative unpaid
$ 36,000
44,700
53,640
62,580
71,520
preferred
dividends
*221 The earnings per share of the corporation's common stock fluctuated widely in the period from 1936 to May 27, 1951. The following is a list of earnings from 1936 to 1954 adjusted to give effect to accumulated but undeclared dividends on the preferred stock and computed by giving effect to the losses sustained by the corporation in businesses unrelated to the ship repair business: Years Ended
Earnings per
Dec. 31
Common Share
1936
$ (23.06)
1937
(112.87)
1938
(9.56)
1939
(8.54)
1940
(18.97)
1941
610.11
1942
192.13
1943
655.28
1944
364.70
Parentheses indicate red figures.
1945
1,035.56
1946
49.26
1947
(921.88)
1948
(564.67)
1949
295.29
1950
879.21
1951 (5 months to May 27)
412.01
1951 (Total)
679.65
1952
463.60
1953
352.43
1954 (Total)
(350.21)
A complete balance sheet of the corporation as of May 27, 1951, reads as follows: ASSETS
Current Assets:
Amounts
Cash in banks and on hand
$ 98,869
Due from banks on discounted contracts
15,387
Receivables: Retain title equipment sales contracts
$1,580,211
Less - Contracts discounted with
1,531,019
recourse
$ 49,192
Notes receivable
22,151
Accounts receivable
1,423,676
Amounts due under incompleted Marine
Repair
Contracts
87,628
Advances to employees
39,642
$1,622,289
Less - Reserve for uncollectible
91,874
accounts
1,530,415
Inventories: Caterpillar and related equipment (new)
$ 459,996
Caterpillar and related equipment
95,489
(used)
Repair parts for equipment
508,950
Boats held for resale
82,797
Work-in-process-equipment service jobs
25,074
Raw materials - Marine Division
456,241
1,628,547
Unexpired insurance
49,387
Deposits and advances on purchase of
307,832
shrimp boats
Other prepaid expenses
9,793
Total Current Assets
$3,640,230
Capital Assets: Land
$ 108,750
Depreciable assets
$1,800,225
Less - Reserve for depreciation
812,643
987,582
1,096,332
Other Assets: Notes receivable
$ 20,000
Unexpired insurance, applicable after 1
25,671
year
Cash surrender value of life insurance
9,942
on officers
Investment in Florida Farm Equipment
281,500
Co.
Miscellaneous
1,370
338,483
Total Assets
$5,075,045
LIABILITIES
Current Liabilities: Notes payable to banks
$1,286,098
Due within one year on purchase money
25,000
mortgage
Accounts payable
892,094
Accrued payrolls and commissions
138,726
Withholding and payroll taxes payable
69,006
Customers' deposits
14,478
Accrued property taxes and sales taxes
31,590
Provision for Federal taxes on income
634,659
Total Current Liabilities
$3,091,651
Long Term Liabilities: Purchase money mortgage payable to
United
States Government
$ 131,250
Less - Amount shown as current
25,000
liability
$ 106,250
Notes payable - banks
24,276
Notes payable - others
45,000
Notes payable - stockholders
230,000
Total Long-Term Liabilities
405,526
Total Liabilities
$3,497,177
Net worth: Preferred stock, 6% cumulative, $100
$ 149,000
par
Common stock, $100 par
44,500
Earned Surplus: Balance - January 1, 1951
$1,196,041
Add - Profit from operations for five
months ending May 27, 1951
188,327
1,384,368
1,577,868
Total Liabilities and Net Worth
$5,075,045
*222 Note: Cumulative unpaid preferred dividends amounted to $75,245, or $50.50 per share, at May 27, 1951. The total profit of the corporation before taxes and adjustments for losses in diversified areas and on liquidation of the "Sea Skiff" business, the profit solely attributable to the "Shipyard Division" operation, and the profit solely attributable to the "Equipment Division" operation for the approximately 5 5/12 years prior to the gift in issue were: Year
Total Profit
Shipyard
Equipment
1946
$127,248
$ 132,509
$ (5,261)
1947
202,490
42,238
160,252
1948
169,345
200,153
(30,808)
1949
203,926
301,754
(97,828)
1950
840,189
752,527
87,662
To 5/27/51
495,073
428,426
66,647
Total
$1,857,607
$180,664 Over this same period a ratio between net profits and sales showed the equipment division was earning profits of approximately 1 per cent of sales and the shipyard division was earning profits at the rate of approximately 12 per cent of sales. During the years 1946 through 1951 the corporation had inadequate working capital and its cash position was bad. In these two respects the condition of the corporation had improved by 1954 when *223 Weed sold his stock to the corporation. The item "Notes payable - stockholders" which appears in the balance sheet of May 27, 1951, in the amount of $230,000 represents a note dated December 28, 1948, payable to George and George, Jr. The face amount was $230,000. Interest rate was 5 per cent per annum payable semiannually since June 30, 1949. The maturity date was December 28, 1951. This note was secured by a mortgage on the corporation's real estate and certain of its equipment, with the real estate being subject to a first mortgage running to the War Assets Administration or its assignee. This note with its mortgage security was immediately assigned by the payees, George and George, Jr., to the Atlantic National Bank of Jacksonville. At the same time, the payees gave the bank a mortgage on certain valuable real estate owned by them individually. By this means, George and George, Jr., secured a loan by the bank to them in the amount of $230,000 which fund they turned over to the corporation in exchange for the corporation note in the same amount running to them. In addition, the corporation note and mortgage, together with the mortgage on their own property, were held by the bank *224 as security for a line of credit running to the corporation in the amount of $800,000. Against this line of credit was charged the $230,000 loan to George and George, Jr. In June 1948 the corporation purchased the present site of its ship repair facilities from the War Assets Administration for $250,000, $50,000 in cash and the balance in quarterly installments over an 8-year period, secured by a first mortgage aforementioned. This site consisted of an outfitting yard which the corporation had been operating under a lease from the United States Navy, and which would have been sold to the highest bidder if the corporation had not acted to acquire the site itself. In 1949 the corporation settled an alleged income tax deficiency for the years 1942 through 1945 in an amount in excess of $1,000,000 for $400,000. This amount was to be paid over a period of years, as agreed to by the Government because the corporation lacked cash to pay the amount of the settlement in a lump payment. The corporation sought to arrange a long-term loan of at least a 5-year duration with two banks but its request was declined. The ship repair business in 1949 was very slow, both generally and particularly *225 with regard to the corporation. The income tax settlement found the corporation with only $25,000 cash on hand. The corporation therefore was forced to allow payment of debts to trade creditors other than Caterpillar Tractor to fall behind. Caterpillar Tractor executives, however, aware that the corporation was in financial straights demanded that George and George, Jr., execute a personal guarantee agreement in favor of Caterpillar Tractor to assue that debts of the corporation to it would be met. In 1950 the corporation, in order to procure liquid funds to pay past and current tax liabilities, attempted to work out a mortgage or debenture loan in the amount of $500,000 through mortgage brokers in Jacksonville. The proposal was submitted to New York Life Insurance Company, New York, N. Y., Connecticut General Life Insurance Company, Hartford, Connecticut, National Life Insurance Company, Montpelier, Vermont, and The Mutual Benefit Life Insurance Company, Newark, New Jersey. Only one company expressed any interest in the proposal, and that company indicated it would consider a loan in the amount of $300,000. This proposal was unacceptable to the management of the corporation since *226 the effect of acceptance would have been to make available only some $120,000 in new funds as there was then outstanding the first mortgage to the War Assets Administration which the insurance company demanded be paid off as a condition of the loan and this mortgage debt amounted to approximately $180,000 at that time. A second similar attempt was made by the corporation in 1950 to procure liquid funds in the form of a loan - this time from the Reconstruction Finance Corporation. This agency indicated its willingness to loan the corporation $400,000 upon the following conditions: (1) The stockholders put into the corporation $150,000 in new funds, (2) the loan be personally guaranteed by all of the stockholders of the corporation, and (3) the first mortgage held by the War Assets Administration on the real property of the corporation in the amount of $175,000 be paid off. For reasons similar to rejection of the insurance company's counteroffer this proposal was unacceptable to the corporation. In 1949 and 1950 a major source of the earnings of the corporation was the conversion of two uncompleted British aircraft carriers for an Italian customer. These ships, the Athling and the *227 Fencer, were converted by a procedure, unorthodox in the ship repair business, of removing deckhouses from two Liberty ships and putting them on the carriers. This procedure was attractive to the customer, because it saved $250,000 in initial construction. The volume of work in this conversion operation was approximately $2,000,000 - the largest job in the corporation's yard since the end of World War II. These earnings from this conversion contract were used for the payment of the income tax assessment for the year 1950. In June 1950 the Korean War commenced. It provided a great stimulus to the activity in the shipyard and equipment divisions. Beginning at this time the ship repair and construction industry was in general engaged in defense work again, and the corporation was in particular engaged in the repair and construction work involved in reactivation of merchant shipps from the moth ball fleet and connected with other war projects. In November 1950 the corporation leased an 18,000-ton floating drydock from the United States Navy for a 5-year term, the lease being cancelable upon 24 hours' notice. This drydock was used, after installation, along with a 4,000-ton drydock *228 purchased as part of the ship repair site acquired in 1948. Before the 18,000-ton drydock could be placed in operation, however, the corporation expended $400,000 to dredge a hole for the dock and to install mooring guides. This expenditure used up much of the profit of the corporation before taxes of 1950 so that management was faced with the possible inability of paying its tax liability for that year. Despite the weak cash position of the corporation the expenditure was considered worthwhile because acquisition and installation of the larger drydock would enable the corporation for the first time to repair large tankers and other cargo ships. It was not until the latter part of 1951, however, that the corporation was able to achieve a place on the bidding lists of the large oil carriers such as Esso, Socony Vacuum, and Gulf. In December 1950 the loan from George and George, Jr., to the corporation in the amount of $230,000 was renewed on a 3-year basis to improve the capital position of the corporation. George and George, Jr., were able in turn to renew their loan from the Atlantic National Bank of Jacksonville. The ship repair and construction business is accurately to be *229 characterized as "feast or famine." It is directly influenced by changes to and from a defense or war economy and the commencement and termination of expenditures, public and private, incident thereto. The repair business, particularly with regard to tanker repair, is seasonal and the corporation, with its larger 18,000-ton drydock installed and in use, was largely dependent on tanker repair business vis-a-vis other cargo ship repair because the geographical location of the corporation made the repair of other dry cargo ships unattractive insofar as the shipowner was concerned. In the repair business generally the backlog of work is only approximately 20 days. There is great competition and uncertainty in bidding for work, with a great premium placed on the personal intangible qualities of management which fosters good will for the repair company. And there exists the risk of not completing work within the narrow time limit allowed by the shipowners and of finding the repair company removed from a bidding list, because tankers are valuable only when sailing and command large demurrages a day which an owner loses when they are idle in repair yards. The value of the common stock *230 of the corporation as of June 5, 1951 was $1,100 a share. Opinion KERN, Judge: In these cases we are required to resolve the question as to what is the value of the common stock of a closely held corporation for gift tax purposes. This question is basically one of fact. Estate of Thomas W. Tebb, 27 T.C. 671. "Value" is defined by the applicable regulation as "the price at which such property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell." See Regulations 108, sec. 86.19(a). And "[court] decisions frequently state in addition that the hypothetical buyer and seller are assumed to be able, as well as willing, to trade and to be well informed about the property and concerning the market for such property." See Revenue Ruling 54-77, 1954-1 C.B. 187. Petitioners have attempted to prove a value of $1,000 a share for the stock and have sought to demonstrate the correctness of the method of valuation which they employed. Alternatively, they argue that in no event could the value of the shares *231 have exceeded $1,100 because they were subject at the time of gift to outstanding and currently enforceable options to purchase, exercisable at that figure. Respondent has attempted to prove a valuation of $2,500 and argues that his method of valuation is correct. He also argues that the options outstanding were without effect in these cases for purposes of determining the value of the gifts here involved. There is little dispute between the parties with regard to the evidentiary facts. The difference between them lies in the degree of emphasis or deemphasis which they give to the various factors relevant to the question of fair market value. For example, the respondent stresses among other factors the book value of the stock and the considerable earnings of the corporation during the year of the gifts and the years immediately preceding it, while the petitioners stress among other factors the erratic earning history of the corporation over a greater number of years, the failure of the corporation to pay dividends, the critical cash position of the corporation and its lack of working capital, and the sales of its stock in 1948 and 1954. Both parties present arguments based upon *232 comparisons made with other corporations. However, these companies are unlike the corporation here involved in so many particulars that we have not been impressed with the comparisons made. Each party has presented expert testimony. The expert witness testifying for petitioners persuasively justified his valuation of $1,000 a share made in 1951, while the expert witness testifying for the respondent explained intelligently and in detail his valuation of $2,500 a share made in 1956. We have carefully considered this expert testimony and the entire record before us in an attempt to give the proper weight to the various factors pertinent to the ultimate questions before us. There is no mathematical table which prescribes the proportionate weight to be given to each such factor. Revenue Ruling 54-77, supra, reads in part: "No formula can be devised that will be generally applicable to the multitude of different valuation issues arising in estate and gift tax cases. Often an appraiser will find wide differences of opinion as to the fair market value of a particular stock. In resolving such *233 differences he should maintain a reasonable attitude in recognition of the fact that valuation is not an exact science. A sound valuation will be based upon all the relevant facts, but the elements of common sense, informed judgment and reasonableness must enter into the process of weighing those facts and determining their aggregate significance. * * *
"Because valuations cannot be made on the basis of a prescribed formula, there is no means whereby the various applicable factors in a particular case can be assigned mathematical weights in deriving the fair market value. For this reason no useful purpose is served by taking an average of several factors (for example: book value, capitalized earnings and capitalized dividends) and basing the valuation on the result. Such a process excludes active consideration of other pertinent factors, and the end result is incapable of being supported by a realistic application of the significant facts in the case except by the mere chance." We have tried to assess the relevant facts with that "common sense, informed judgment and reasonableness" which is recommended in the quotation just made. The result of our attempt is a conclusion that *234 the stock of the corporation had a fair market value of $1,100 a share on June 5, 1951. In reaching this conclusion we have not considered the price named in the options granted to George, Jr., in 1948. Therefore, it is unnecessary to consider petitioners' alternative argument that the option price was determinative of and limited the value of the stock in 1951. Decisions will be entered under Rule 50. Footnotes
1. This paragraph is taken verbatim from the stipulation.↩